Wireless One, Inc. v. Mayor and City Council of Baltimore, et al., No. 70, September Term, 2018

**MD. CODE ANN., REAL PROP. (1974, 2015 REPL. VOL.) ("RP") § 12-205(a) – MOVING AND RELOCATION EXPENSES – RP § 12-201(e) – "DISPLACED PERSON" –** Court of Appeals held that former tenant of public market in Baltimore City was not "displaced person," as defined in RP § 12-201(e)(1)(i), because it voluntarily terminated its lease and abandoned its stall at market before action by defendants to terminate lease and before any redevelopment occurred. Tenant left market on its own accord before any action to terminate lease, other than advisement that it would not "fit in [redevelopment] plans" for market and that it should pursue other options. Thus, tenant did not qualify as "displaced person" under plain language of RP § 12-201(e)(1)(i), and it was not entitled to moving and relocation expenses under RP § 12-205(a).

Moreover, tenant was not "displaced person" because it "lease[d] from [] displacing agency after [] displacing agency [took] title to [] real property[.]" RP § 12-201(e)(2)(iii). Applying plain and unambiguous language of RP § 12-201(e)(2)(iii)—that person who leases from displacing agency after displacing agency takes title to real property is not displaced person—led to inescapable conclusion that tenant was not displaced person, as it undisputedly leased property well after displacing agency took title to property. Although unnecessary to resort to review of legislative history, holding concerning plain language of RP § 12-201(e)(2)(iii) was fully supported by legislative history, and legislative history did not compel contrary interpretation.

Circuit Court for Baltimore City
Case No. 24-C-17-003125
Argued: May 2, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 70

September Term, 2018

_____

WIRELESS ONE, INC.

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE, ET AL.

_____

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty
Booth,

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., and McDonald, J., dissent.

_____

Filed: August 23, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case involves an action by a former tenant of a public market in Baltimore City to recover moving and relocation expenses under Md. Code Ann., Real Prop. (1974, 2015 Repl. Vol.) ("RP") § 12-205(a) and for an alleged unconstitutional taking. Under RP § 12-205(a), "[w]henever a program or project undertaken by a displacing agency will result in the displacement of any person, the displacing agency shall make a payment to the displaced person, on proper application as approved by the displacing agency for[,]" among other things, the "[a]ctual reasonable expenses" of moving and searching for a replacement business, and for "[a]ctual direct loss of tangible personal property as a result of moving or discontinuing a business[.]" Whether a person is entitled to moving and relocation expenses under RP § 12-205(a) depends on whether the person is a "displaced person," as defined in RP § 12-201(e). To state the obvious, if a person is not a "displaced person," as that term is statutorily defined, then the person seeking compensation is not entitled to moving and relocation expenses under RP § 12-205(a).

RP § 12-201(e) defines a "displaced person" as follows:

(1) "Displaced person" means:

(i) Any person who moves from real property, or moves his [or her] personal property from real property:

1. As a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part by a displacing agency; or

2. On which that person is a residential tenant or conducts a small business, a farm operation, or a nonprofit organization, in any case in which the head of the displacing agency determines that displacement is permanent, as a direct result of rehabilitation, demolition, or other displacing activity as the lead agency may prescribe, undertaken by a displacing agency;

and

* * *

(2) "Displaced person" does not include:

> (i) Except to the extent that this exclusion conflicts with federal financial participation requirements, any person who, on the open market, without threat of condemnation, sells his [or her] real property to a displacing agency;

> (ii) Unlawful occupants, or anyone occupying such dwelling for the purpose of obtaining assistance under this subtitle; or

> (iii) A person who leases from the displacing agency after the displacing agency takes title to the real property, or any person other than a person who was an occupant of such property at the time it was acquired who occupies the property on a rental basis for a short term or period subject to termination when the property is needed for the program or project.

In this case, Baltimore City has owned and operated the market since 1847. From 2004 to February 2017, the tenant leased space in the market; as of 2016, the tenant's lease was on a month-to-month basis. In late 2016, a rental agent for the market advised the tenant that its business did not "fit in the [redevelopment] plans" for the market and that it "should pursue other options[.]" In February 2017, the tenant vacated the market. In June 2017, the tenant sued, seeking compensation for moving and relocation expenses as a displaced person and for an alleged unconstitutional taking. The defendants filed a motion to dismiss, which the trial court granted, concluding that the former tenant did not qualify as a "displaced person" because of the exemption in RP § 12-201(e)(2)(iii). The Court of Special Appeals affirmed the trial court's judgment, agreeing that the exemption in RP § 12-201(e)(2)(iii) applies and that the former tenant was not a "displaced person." Against

this backdrop, we must decide whether the former tenant is a "displaced person," as that term is defined in RP § 12-201(e)(1)(i), whether the exemption in RP § 12-201(e)(2)(iii) applies, and whether the tenant has stated a claim for an unconstitutional taking.

We hold that the former tenant is not a "displaced person," as that term is defined in RP § 12-201(e)(1)(i), because it voluntarily terminated its lease and abandoned its stall at the market before action by the defendants to terminate the lease and before any redevelopment occurred. The former tenant left its stall at the market on its own accord before any action to terminate the lease, other than the advisement that it would "not fit in the [redevelopment] plans" for the market and that it should pursue other options. Thus, the former tenant does not qualify as a "displaced person" under the plain language of RP § 12-201(e)(1)(i), and it was not entitled to moving and relocation expenses under RP § 12-205(a). In addition to concluding that the former tenant is not a "displaced person" under the plain language of RP § 12-201(e)(1)(i), we hold that the tenant is not a "displaced person" because it "lease[d] from the displacing agency after the displacing agency [took] title to the real property[.]" RP § 12-201(e)(2)(iii). Applying the plain and unambiguous language of RP § 12-201(e)(2)(iii)—that a person who leases from a displacing agency after the displacing agency takes title to the real property is not a displaced person— inescapably leads to the conclusion that the tenant is not a displaced person, as it undisputedly entered into its lease well after the displacing agency took title to the market. Although unnecessary to resort to a review of the legislative history, our holding concerning the plain language of RP § 12-201(e)(2)(iii) is fully supported by the legislative history, and the legislative history does not compel a contrary interpretation. As such, we

- 3 -

hold that the tenant was not wrongfully denied moving and relocation expenses, and there was no unconstitutional taking. Accordingly, we affirm the Court of Special Appeals's judgment.

## BACKGROUND

In 1847, the Cross Street Market ("the Market") was established in Baltimore City. At all times since 1847, the Mayor and Council of Baltimore City ("the City"), Respondent, has owned and operated the Market. In 1994, the City established the Baltimore Public Markets Corporation ("the Markets Corporation"), Respondent, to assist with the regulation, control, and maintenance of the Market and other public markets in Baltimore City. In 2004, Wireless One, Inc. ("Wireless One"), Petitioner, began leasing a stall in the Market from the City.[1] Wireless One's business consisted of leasing cell phones and related equipment, such as chargers. As of 2016, Wireless One's lease was a month-to-month lease.

On November 9, 2016, through the Markets Corporation, the City entered into a management agreement with CSM Ventures, LLC ("CSM"), a subsidiary of Caves Valley Partners ("Caves"), to operate and redevelop the Market. The management agreement authorized CSM to lease portions of the Market and terminate existing tenancies. Under the management agreement, the Markets Corporation was required to pay CSM $2 million to redevelop and operate the Market.

It is undisputed that, in late 2016, Wireless One was advised that it would not fit

---

[1]Since 2013, Wireless One has traded under the name "Digital 2000 LLC."

- 4 -

into the plans for the redeveloped Market, and that it should pursue other options.  On

December 21, 2016, on behalf of CSM and Caves, a representative sent an e-mail message

to Wireless One and other Market tenants concerning the redevelopment of the Market.  In

the e-mail, the representative stated, in pertinent part:

> [O]n January 9th, most of you will receive a Letter of Intent, along with current draft space plans for the new [M]arket, for your review and consideration as prospective tenants.  There are a very limited number of tenants who we know will not fit in the plans.  Those tenants have been informed that they should pursue other options going forward. . . .
>
> At the merchants['] meeting last month, Arsh Mirmiran from CSM [] promised that the current [M]arket would continue to operate until at least April 1, 2017.  I would like to reiterate that and let you know that it will likely continue for a bit longer than that.  Once we know an official date, we will let you all know.
>
> * * *
>
> Regardless of whether or not we are able to reach agreement for you to be part of the redeveloped [M]arket, we will work with you and the [] Markets Corporation to provide options for temporary and/or permanent relocation spaces.  These spaces would be in either Lexington Market or Hollins Market, both of which are going to be refreshed, as well.  The Markets Corp[oration] has confirmed that there is adequate space to accommodate all current tenants of [the] Market, should you so choose.  If neither of those options is of interest, I can work directly with you to find you space closer to Cross Street, either in currently vacant storefronts or in existing spaces that may become available.
>
> * * *
>
> As I mentioned, please let me know if you'd like any additional information.  All of this is still a work in progress and we don't have all the answers yet, but we are methodically getting there and we appreciate your continued interest and patience.

According to an affidavit from Arsh Mirmiran, a partner at Caves, on or around

January 24, 2017, a Wireless One representative requested to terminate Wireless One's

- 5 -

month-to-month lease and to vacate the stall at the Market by February 1, 2017, with the agreement that Wireless One would not be billed for February 2017 rent. Mirmiran averred that management agreed with Wireless One's request. On February 8, 2017, Wireless One vacated the Market. At that time, Wireless One removed all of its inventory, but left the physical stall, including counters and storage shelves, which were affixed to the stall and unable to be removed.

### Circuit Court Proceedings

On June 2, 2017, in the Circuit Court for Baltimore City, Wireless One filed a complaint against Respondents, alleging that it was a "displaced person," as defined by RP § 12-201(e)(1), that Respondents were displacing agencies as defined by RP § 12-201(f), and that it was entitled to moving and relocation expenses under RP § 12-205(a). Wireless One also alleged that there had been an unconstitutional taking of its property without compensation, in violation of the United States and Maryland Constitutions. As to the circumstances surrounding its vacating of the Market, in the complaint, Wireless One alleged that it "was informed that it would not fit in the plans for the redeveloped [M]arket and that it should pursue other options[,]" and that it "vacated the [M]arket on February 8, 2017." Wireless One alleged that "[i]t removed the cell[ ]phone inventory but left the physical stall consisting of counters, storage shelves, etc., since they were built in and not able to be moved."

On July 11, 2017, Respondents filed a motion to dismiss, or, in the alternative, for summary judgment, arguing, among other things, that Wireless One was not a "displaced person" because Wireless One terminated its lease voluntarily and because of the

- 6 -

exemption in RP § 12-201(e)(2)(iii), and that there was no taking. Respondents contended that Wireless One did not meet the definition of a "displaced person" under RP § 12-201(e)(1) because Wireless One "walked away from its month-to-month lease voluntarily." According to Respondents, although Wireless One "may have been informed that it would not fit into some future plans for a new, redesigned [M]arket [], the threat of redevelopment alone [was] not sufficient for [Wireless One] to be considered a displaced person that [was] entitled to moving and relocation expenses." (Citation omitted). Respondents argued that Wireless One had failed to allege that rehabilitation had occurred or been undertaken, that Respondents had "made any sort of effort to evict [Wireless One] from the Market in pursuit of [] renovation[,]" or that there had been written notice of an intent to acquire or acquisition of the real property. Respondents asserted that, moreover, Wireless One was "exempt from the definition of 'displaced person'" under RP § 12-201(e)(2)(iii) because it leased the stall in the Market after the City acquired title to the Market. Respondents attached as an exhibit to the motion Mirmiran's affidavit, dated July 6, 2017, in which he averred, in pertinent part:

> [] On or around January 24, 2017, a representative from Wireless One[] contacted representatives of management and requested to terminate the month-to-month lease and vacate the stall by February 1, 2017, with the agreement that they would not be billed for February rent.
>
> [] Management agreed, and Wireless One[] voluntarily vacated the premises in February 2017.
>
> [] CSM [] did not terminate Wireless One's lease, nor did it notify Wireless One[] that it had to leave by a date certain.
>
> [] While CSM [] eventually plans to renovate [the] Market, it has not yet begun to do so, nor has it terminated the leases of any tenants in pursuit of

- 7 -

this project; in fact, all remaining tenants were offered, and agreed to, lease renewals through September 5, 2017. Wireless One[] was not offered this lease renewal because it had already vacated the [M]arket at that time.

[] While the items left behind by Wireless One[] are fixtures, it is welcome to return and remove the items. CSM [] has no plans to utilize the fixtures for the public use.

On September 11, 2017, the circuit court conducted a hearing on the motion and heard argument from the parties. On the same day, the circuit court issued an order granting the motion and dismissing the complaint. In the order, the circuit court explained that it agreed with Respondents' argument that the exemption in RP § 12-201(e)(2)(iii) applied, stating:

> In the instant case, it is undisputed that the Market was established by [the] City in 1847, and has been owned and operated by [the] City since its inception. [Wireless One] cannot overcome the plain language of [RP] § 12-201(e)(2)(iii), which specifically exempts "[a] person who leases from the displacing agency ***after the displacing agency takes title to the real property***." [Wireless One]'s lease was executed in 2004, many years after [the] City acquired title to the Market. Additionally, the Management Agreement between [the] City and Caves [] did not transfer title to the Market; rather, the Management Agreement merely gave Caves [] the ability to operate, manage, and redevelop the Market. Thus, [Wireless One] has failed to state a claim for relocation and moving expenses pursuant to [RP] § 12-20[5(a)].

(Emphasis and some alterations in original). The circuit court also ruled that "no taking ha[d] occurred" because Wireless One was "not within the class of persons entitled to relief under [RP] § 12-20[5(a)]." The circuit court rejected Wireless One's argument that there was a taking because its fixtures became valueless, explaining that Mirmiran averred that Wireless One was "welcome to return and remove the items[,]" and that, "[i]t [was] quite

- 8 -

clear, then, that [Wireless One] abandoned its property affixed to the Market."[2]

On September 20, 2017, Wireless One filed a motion to alter or amend, which the

circuit court denied.

## Appellate Proceedings

Wireless One appealed.[3]  On December 21, 2018, in a reported opinion, the Court

of Special Appeals affirmed the circuit court's judgment.[4]  See Wireless One, Inc. v. Mayor

---

[2]In its opinion, as to the circuit court's ruling, the Court of Special Appeals stated:

> We note that the format of the court's judgment did not strictly comply with the requirement of Maryland Rule 2-601(a)(1), which mandates: "Each judgment shall be set forth on a separate document and include a statement of an allowance of costs as determined in conformance with Rule 2-603." Here, the court's judgment of dismissal appears on the sixth page of the written opinion explaining the court's reasoning. . . . Nevertheless, the separate document requirement is not jurisdictional, and strict compliance may be waived where a technical application of the separate document requirement would only result in unnecessary delay.  The Court of Appeals has held that strict compliance with the separate document rule can be waived, at least where the trial court intended the docket entries made by the court clerk to be a final judgment and where no party objected to the absence of a separate document after the appeal was noted.  In this case, no party has objected to the form of the court's order of dismissal, and the docket entry of 9/14/17 accurately sets forth the substance of the court's judgment. Accordingly, we deem the lack of a separate document to be waived.

Wireless One, Inc. v. Mayor and City Council of Baltimore City, 239 Md. App. 687, 695 n.3, 198 A.3d 892, 897 n.3 (2018) (cleaned up).  We agree with the Court of Special Appeals's reasoning on this point.

[3]Wireless One also filed in this Court a petition for a writ of *certiorari*, which we denied on April 20, 2018.  See Wireless One v. Mayor and City Council of Baltimore, 458 Md. 600, 183 A.3d 166 (2018).

[4]The Court of Special Appeals initially filed an unreported opinion on November 16, 2018.  See Wireless One, Inc. v. Mayor and City Council of Baltimore City, No. 1852, Sept. Term, 2017, 2018 WL 60015808 (Md. Ct. Spec. App. Nov. 16, 2018).  On November 30, 2018, the City filed a Request for Designation of Opinion for Reporting.  On December

and City Council of Baltimore City, 239 Md. App. 687, 689, 198 A.3d 892, 893 (2018). The Court of Special Appeals quoted with approval the circuit court's reasoning that the exemption in RP § 12-201(e)(2)(iii) applied, holding: "We agree with the [circuit] court's analysis." Wireless One, 239 Md. App. at 695, 198 A.3d at 896-97 (footnote omitted). The Court of Special Appeals also determined that, because "the City did not wrongfully deny Wireless [One] moving and relocation expenses, . . . the [circuit] court did not err in ruling that Wireless [One] 'ha[d] failed to state a claim for an unconstitutional taking.'" Id. at 696, 198 A.3d at 897.

On December 27, 2018, Wireless One petitioned for a writ of *certiorari*, raising the following two issues:

> [1.] Under [RP §] 12-201[(e)](1)(i)(2), is a person who leaves a publicly funded facility as a result of demolition or rehabilitation excluded from relocation benefits if it leased after the unit of government acquired title to the real property?
>
> [2.] Has Wireless [One] stated a claim for an unconstitutional taking?

On February 4, 2019, this Court granted the petition. See Wireless One v. Mayor and City Council of Baltimore, 462 Md. 556, 201 A.3d 1228 (2019).

On May 2, 2019, this Court heard oral argument in the case. At oral argument, questions arose concerning the statutory construction and legislative history of RP §§ 12-201 and 12-205. On May 3, 2019, this Court issued an order authorizing the Attorney

---

11, 2018, Wireless One filed a response in which it "support[ed] the request to designate [the] opinion for reporting." On December 21, 2018, the Court of Special Appeals issued a reported opinion. See Wireless One, Inc. v. Mayor and City Council of Baltimore City, 239 Md. App. 687, 198 A.3d 892 (2018).

General to file an amicus brief. In the order, we stated:

> Whereas, this appeal involves construction of the relocation and assistance provisions of [RP] § 12-201 et seq.[,] an issue in which the State may have an interest, and pursuant to Maryland Constitution, Art. V, § 6, it is this 3rd day of May[,] 2019,
>
> **ORDERED**, by the Court of Appeals of Maryland, pursuant to Maryland Rule 8-511(a)(3), that the Attorney General may file a brief in the above-captioned case as Amicus Curiae concerning the appropriate construction of [RP] § 12-201 et seq.

On June 12, 2019, the Attorney General filed an amicus brief. In the amicus brief, the Attorney General contended that RP § 12-201(e)(2)(iii) is ambiguous, that there is a "latent ambiguity" in the definition of "displacing agency" in RP § 12-201(f), and that RP § 12-201 should be construed consistently with the counterpart federal statute. The Attorney General argued:

> With respect to the appropriate construction of [RP] § 12-201(e)(2)(iii), which excludes from the definition of "displaced person" a "person who leases from the displacing agency after the displacing agency take[s] title to the real property," that provision should be construed consistently with its federal counterpart, 42 U.S.C. § 4601(6)(B)(ii), such that this exclusion is only applicable in those cases in which the displacing agency has acquired property for a program or project (and any lease has taken effect after such acquisition).

On July 2, 2019, Respondents filed a reply to the amicus brief, contending that the language of RP § 12-201(e)(2)(iii) is plain and unambiguous, that the Attorney General's interpretation of the provision conflicts with the statute's plain language and legislative history, and that the Attorney General's reading of the legislative history is "flawed." We set forth the contentions raised in the amicus and reply briefs in greater detail below.

## DISCUSSION

## The Parties' Contentions

Wireless One contends that the circuit court erred in granting the motion to dismiss because, under RP § 12-201(e)(1)(i)(2), "a person who leaves a publicly funded facility as a result of demolition or rehabilitation is not excluded from relocation benefits if it leased after the unit of government acquired title to the real property." In other words, Wireless One argues that it qualified as a "displaced person" under RP § 12-201(e)(1)(i)(2). Wireless One asserts that the City was not a "displacing agency" because it was not carrying out a public works project, or a project with State financial assistance, when the City established the Market in 1847. Wireless One maintains: "Applying the test of [RP §] 12-201(f), it is clear that the [circuit] court [erred] when it applied the exclusion of [RP §] 12-201[(e)](2) to the City's establishment of the [] Market in [1]847 simply on the basis of the City's ownership in [1]847." Wireless One contends that the circuit court's interpretation of the relevant statutes essentially renders compensation for moving and relocation expenses under RP § 12-205(a) a "nullity" because someone in Wireless One's position—*i.e.*, a tenant who entered into a lease after the lessor acquired title—would never be able to recover.

Respondents counter that the circuit court properly dismissed the complaint for failure to state a claim upon which relief could be granted. Respondents contend that Wireless One is not entitled to relocation expenses because it is not a "displaced person" under RP § 12-201(e). Specifically, Respondents argue that, under the plain language of RP § 12-201(e)(2)(iii), Wireless One is excluded from the definition of "displaced person,"

- 12 -

as it is undisputed that Wireless One leased the Market stall from the City more than 150 years after the City acquired title to the Market. Respondents assert that the applicability of RP § 12-201(e)(2) does not depend on when the lessor became a "displacing agency," because nothing in that provision "requires the City to have been a displacing agency at the time it acquired title to trigger the exception." (Emphasis omitted). Respondents maintain that, because the plain language of RP § 12-201(e) is clear and unambiguous, this Court need not go further, but Respondents also contend that the legislative history "confirms that the definition of 'displaced person' excludes anyone who leases after the government takes title to the property, regardless of whether the government was a 'displacing agency' at the time it took title."

Respondents assert that interpreting RP § 12-201(e)(2) in the manner in which the circuit court and Court of Special Appeals did, and applying it in this case, does not create a legal nullity, as there may be persons who enter into leases before a displacing agency takes title. Respondents contend that, even if RP § 12-201(e)(2) does not bar recovery, dismissal of the case was nevertheless proper because Wireless One's relocation was not the result of a displacement due to a program or project undertaken by the City, but instead was the result of its own unilateral decision to terminate its lease. Respondents argue that, although the City owned the Market at the time that "Wireless One abandoned the premises, its rehabilitation was far from certain. And[,] during that time, either party could have terminated the month-to-month tenancy, for any reason, with a mere thirty days' notice." (Footnote omitted). As such, Respondents assert that "Wireless One's voluntary departure could not have been the 'direct result' of rehabilitation[,]" as required to recover

- 13 -

moving and relocation expenses under RP § 12-205(a).

## Standard of Review

Recently, in <u>Floyd v. Mayor and City Council of Balt.</u>, 463 Md. 226, 241, 205 A.3d 928, 937 (2019), we stated that "we review without deference a trial court's grant of a motion to dismiss," explaining:

> Considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted. Consideration of the universe of "facts" pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any. The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice. Upon appellate review, the trial court's decision to grant such a motion is analyzed to determine whether the court was legally correct.

(Citation omitted). And,

> [s]imilarly, where, in considering a motion to dismiss, a trial court considers materials, such as affidavits, outside of the complaint (*i.e.*, the complaint and documents attached thereto), we treat the trial court's grant of a motion to dismiss as a grant of summary judgment, and we review the matter without deference for legal correctness.

<u>Id.</u> at 241, 205 A.3d at 937 (citation omitted).

## Statutory Construction

In <u>Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.</u>, 456 Md. 272, 294-95, 173 A.3d 549, 561-62 (2017), "we set forth the relevant rules of statutory construction[,]" stating:

The cardinal rule of statutory construction is to ascertain and effectuate the intent of the General Assembly.

As this Court has explained, to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.

If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives, and the purpose of the enactment under consideration. We have said that there is an ambiguity within a statute when there exist two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.

If the true legislative intent cannot be readily determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

In construing a statute, we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

In addition, the meaning of the plainest language is controlled by the context in which it appears. As this Court has stated, because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only

are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.

(Citation omitted).

## Relevant Law

Before discussing moving and relocation expenses pursuant to RP § 12-205(a), we set forth the following brief background on condemnation proceedings generally. As we explained in A & E N., LLC v. Mayor & City Council of Balt., 431 Md. 253, 260, 64 A.3d 903, 907 (2013), "[a] condemnation action is the State's exercise of the power of eminent domain[,]" which "is the inherent power of a governmental entity to take privately owned property and convert it to public use[.]" (Cleaned up). Importantly, "the power to condemn is not absolute[,]" and "government entities may only take private property for public use and with a payment of just compensation to the affected property owner[, and] there must be some necessity for the taking." Id. at 260, 64 A.3d at 908 (cleaned up). Determining the amount of just compensation "is the jury's responsibility, unless all parties file a written election submitting the case to the court for determination[.]" Id. at 261, 64 A.3d at 908 (cleaned up). An award constitutes just compensation "if it reflects the fair market value of the property." Id. at 261, 64 A.3d at 908 (cleaned up).

Notably, "just compensation for the taking of property is not the only type of compensation to which a condemnee may be entitled. Both federal and Maryland statutes provide for relocation assistance to persons affected by condemnation." Id. at 262, 64 A.3d at 908-09 (internal quotation marks omitted). Subtitle 2 of Title 12 of the Real Property Article sets forth the various types of relocation assistance available in Maryland. RP §

12-205(a) "requires a 'displacing agency' to compensate a 'displaced person' for certain expenses incurred as a result of the displacing agency's acquisition or written notice of intent to acquire the displaced person's property." Coll. Bowl, Inc. v. Mayor and City Council of Balt., 394 Md. 482, 485, 907 A.2d 153, 155 (2006). RP § 12-205(a) provides:

> Whenever a program or project undertaken by a displacing agency will result in the displacement of any person, the displacing agency shall make a payment to the displaced person, on proper application as approved by the displacing agency for:
>
> > (1) Actual reasonable expenses in moving him[- or her]self, his [or her] family, business, farm operation, or other personal property;
> >
> > (2) Actual direct loss of tangible personal property as a result of moving or discontinuing a business or farm operation, but not exceeding an amount equal to the reasonable expenses that would have been required to relocate the personal property, as determined by the agency;
> >
> > (3) Actual reasonable expenses in searching for a replacement business or farm; and
> >
> > (4) Actual reasonable expenses necessary to reestablish a displaced farm, nonprofit organization, or small business at its new site as determined by the displacing agency, but not to exceed $60,000.

This Court has recognized that "[t]he key issue with respect to [a plaintiff]'s entitlement to compensation under [RP § 12-205(a)] is whether it qualifies as a 'displaced person.'" Coll. Bowl, 394 Md. at 486, 907 A.2d at 155. See also A & E N., 431 Md. at 269, 64 A.3d at 913 ("[B]eing a 'displaced person' is a prerequisite in any relocation assistance case."). In its entirety, RP § 12-201(e) defines "displaced person" as follows:

> (1) "Displaced person" means:
>
> > (i) Any person who moves from real property, or moves his [or her] personal property from real property:

1. As a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part by a displacing agency; or

2. On which that person is a residential tenant or conducts a small business, a farm operation, or a nonprofit organization, in any case in which the head of the displacing agency determines that displacement is permanent, as a direct result of rehabilitation, demolition, or other displacing activity as the lead agency may prescribe, undertaken by a displacing agency; and

(ii) Solely for the purposes of [RP] §§ 12-205(a) and (b) [], any person who moves from real property, or moves his [or her] personal property from real property:

1. As a direct result of written notice of intent to acquire or the acquisition of other real property, in whole or in part, on which such person conducts a business or farm operation, by a displacing agency; or

2. As a direct result of rehabilitation, demolition, or other displacing activity as the lead agency may prescribe, of other real property on which such person conducts a business or a farm operation in any case in which the head of the displacing agency determines that displacement is permanent, by a displacing agency.

(2) "Displaced person" does not include:

(i) Except to the extent that this exclusion conflicts with federal financial participation requirements, any person who, on the open market, without threat of condemnation, sells his [or her] real property to a displacing agency;

(ii) Unlawful occupants, or anyone occupying such dwelling for the purpose of obtaining assistance under this subtitle; or

(iii) A person who leases from the displacing agency after the displacing agency takes title to the real property, or any person other than a person who was an occupant of such property at the time it was acquired who occupies the property on a rental basis for a short term

or period subject to termination when the property is needed for the program or project.

RP § 12-201(f) defines "displacing agency" as follows:

"Displacing agency" means any public or private agency or person carrying out:

> (1) A program or project with federal financial assistance;
>
> (2) A public works program or project with State financial assistance; or
>
> (3) Acquisition by eminent domain or by negotiation.

In Coll. Bowl, 394 Md. at 484, 907 A.2d at 154, this Court held that summary judgment was properly granted in favor of the City and that "the City was not required to reimburse [the plaintiff] for relocation expenses[.]" The plaintiff, a sports apparel manufacturer, contended "that it lost its tenancy and was forced to relocate its business due to insistence by [the] City that [the plaintiff]'s landlord redevelop the building in which [the plaintiff]'s business was located and threats by the City to condemn the building if that was not done." Id. at 483-84, 907 A.2d at 154. The plaintiff was a month-to-month commercial tenant in a building owned by the David and Annie E. Abrams Realty Corporation ("Abrams"). See id. at 484, 907 A.2d at 154. In 1997, Abrams entered into preliminary discussions with the City to explore development options; in 2000, Abrams obtained zoning approval to construct dwelling units in the building, including the space occupied by the plaintiff. See id. at 484, 907 A.2d at 154. In 2002, the City "began to press Abrams to commence acceptable redevelopment and, at various times thereafter, expressed the intent, in default thereof, to obtain authority to condemn the structure." Id.

at 484, 907 A.2d at 154. In June 2002, a City Council bill was introduced that would have allowed the City to acquire various properties through condemnation, including Abrams's building. See id. at 484, 907 A.2d at 154.

In November 2002, while the bill was pending, Abrams notified the plaintiff of its intent to end the landlord-tenant relationship, and, in February 2003, Abrams gave written notice of termination of the plaintiff's month-to-month lease, effective April 30, 2003. See id. at 484, 907 A.2d at 154. In March 2003, the plaintiff vacated the building and relocated its business. See id. at 484, 907 A.2d at 154. A year later, in March 2004, the bill was enacted, although the City did not exercise its authority to acquire the building. See id. at 484-85, 907 A.2d at 154.

In the meantime, in April 2003, after vacating the building, the plaintiff filed a complaint seeking, among other things, compensation for relocation expenses. See id. at 485, 907 A.2d at 154. As to those claims, the trial court granted summary judgment in the City's favor, and the Court of Special Appeals affirmed, "holding that, because [the plaintiff]'s tenancy was terminated by the landlord and not in response to any governmental action by the City, [the plaintiff] was not a 'displaced person' entitled to relocation compensation and its property interest had not been taken by the City." Id. at 485, 907 A.2d at 154-55.

In this Court, we stated that, given the definition of "displaced person" in RP § 12-201(e) and given that the City never acquired the building,

> the critical question [was] whether [the plaintiff]'s displacement was a "direct result" of either a written notice of intent by the City to acquire the property or a determination by the head of the "displacing agency" that [the

plaintiff]'s displacement would be permanent as a direct result of rehabilitation, demolition, or other displacing activity.

Id. at 486, 907 A.2d at 155 (footnote omitted). We noted that, had Abrams taken no action, the City likely would have condemned the building after the bill was enacted, but the plaintiff "was actually forced to relocate and move its personal property because of the termination of its tenancy by Abrams[.]" Id. at 487, 907 A.2d at 156.

As to whether Abrams was forced to terminate the plaintiff's tenancy "because of conduct by the City that would suffice to make [the plaintiff] a 'displaced person' within the meaning of [RP] § 12-201(e)[,]" however, we ultimately determined that the plaintiff was not a displaced person. Id. at 487-88, 907 A.2d at 156. We explained:

> It is undisputed, of course, that the City never [] acquire[d] the property, either by condemnation or through negotiations conducted under the threat of condemnation. [The plaintiff]'s complaint is that the City effectively forced Abrams to terminate [its] lease by threatening, both orally and in writing, to condemn the property unless Abrams proceeded with redevelopment activities that would necessitate termination of the tenancy, and that the City had no authority to make such threats. Its argument, in this regard, is that the City had no authority to inform the property owner that eminent domain authority would be obtained and exercised unless the building was renewed. Whether the City [] possessed authority to make that threat is not the issue. The issue, in terms of compensation for relocation expenses, is, and remains, whether [the plaintiff]'s relocation was the "direct result" of conduct specified in [RP] § 12-201(e), authorized or unauthorized. It clearly was not.
>
> As we have observed, Abrams made some efforts on its own to renovate the building, including a successful pursuit of zoning authority to convert five floors of the building to residential use, and, in February, 2003, presumably in furtherance of those efforts, it terminated the month-to-month tenancy. That termination, by the landlord, occurred more than a year before [the bill] was enacted and thus more than a year before the City had any legal authority to acquire the building through the exercise of eminent domain. There is simply no evidence that termination of the tenancy was the "direct result" of a written notice by the City of its intent to acquire the property or

- 21 -

> a determination by the head of a displacing agency that [the plaintiff]'s displacement was permanent as a direct result of rehabilitation, demolition, or other displacing activity.

Id. at 487-88, 907 A.2d at 156 (cleaned up). We also concluded that there was no taking. See id. at 491, 907 A.2d at 158.

**Analysis**

Here, we hold that Wireless One is not a "displaced person," as that term is defined in RP § 12-201(e)(1)(i), because it voluntarily terminated its lease and abandoned its stall at the Market before action by Respondents or CSM to terminate the lease and before any redevelopment occurred. Wireless One left its stall at the Market on its own accord before any action by Respondents or CSM to terminate the lease, other than the advisement that it would not fit into the redevelopment plans for the Market and that it should pursue other options. Thus, Wireless One does not qualify as a "displaced person" under the plain language of RP § 12-201(e)(1)(i), and it was not entitled to moving and relocation expenses under RP § 12-205(a). In addition to concluding that Wireless One is not a "displaced person" under the plain language of RP § 12-201(e)(1)(i), we hold that Wireless One is not a "displaced person" because it "lease[d] from the displacing agency after the displacing agency [took] title to the real property[.]" RP § 12-201(e)(2)(iii). Applying the plain and unambiguous language of RP § 12-201(e)(2)(iii)—that a person who leases from a displacing agency after the displacing agency takes title to the real property is not a displaced person—inescapably leads to the conclusion that Wireless One is not a displaced person. Although unnecessary to resort to a review of the legislative history, our holding concerning the plain language of RP § 12-201(e)(2)(iii) is fully supported by the legislative

history, and the legislative history does not compel a contrary interpretation. As such, we hold that Wireless One was not wrongfully denied moving and relocation expenses, and there was no unconstitutional taking.

As an initial matter, Wireless One does not qualify as a displaced person under RP § 12-201(e)(1)(i) because it voluntarily terminated its lease and abandoned its stall at the Market before any action by Respondents or CSM to terminate the lease and before any redevelopment occurred. RP § 12-201(e)(1)(i)1 provides that a "displaced person" includes "[a]ny person who moves from real property, or moves his [or her] personal property from real property[ a]s a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part by a displacing agency[.]" (Paragraph break omitted). Here, Wireless One did not allege in its complaint that it received written notice of intent to acquire or the acquisition from Respondents or any other written notice from Respondents of an intent to terminate Wireless One's lease. And, Wireless One has not alleged that Respondents or CSM terminated the lease or otherwise notified Wireless One that it had to leave the Market by a certain date. Rather, in the complaint, Wireless One simply alleged that it was advised that it would not fit the plans for the redeveloped Market and that it "vacated the [M]arket on February 8, 2017." In other words, Wireless One left its stall at the Market on its own accord before receiving a notice of intent or before any action by Respondents or CSM to terminate the lease, other than the mere advisement that it would not fit into the redevelopment plans for the Market.

Nor does Wireless One qualify as a "displaced person" under RP § 12-201(e)(1)(i)2, which provides that a "displaced person" is "[a]ny person who moves from real property,

- 23 -

or moves his [or her] personal property from real property [o]n which that person . . . conducts a small business . . . as a direct result of rehabilitation, demolition, or other displacing activity . . . undertaken by a displacing agency[.]" In the complaint, Wireless One did not allege that rehabilitation or demolition of the Market had taken place, or that any other displacing activity had been undertaken—for example, notice of termination of the lease, the institution of eviction proceedings, or notice that it was required to vacate the Market by a certain date. Walking away from the lease after being advised that it did not fit the plans for redevelopment of the Market falls far short of moving "as a direct result of rehabilitation, demolition, or other displacing activity" under RP § 12-201(e)(1)(i)2.

In short, Wireless One voluntarily left the Market. No action had been taken by Respondents or CSM to terminate the lease.[5] The plain language of RP § 12-201(e)(1)(i) is unambiguous in defining a "displaced person" and, under the circumstances of this case, given that Wireless One unilaterally terminated its lease, Wireless One does not meet the definition of a "displaced person." This makes sense—a tenant cannot qualify as a "displaced person" who is entitled to moving and relocation expenses where the tenant voluntarily walks away from a lease without action by a displacing agency to acquire the property or without rehabilitation, demolition, or some other displacing activity causing

---

[5]We note that, in his affidavit, attached to the motion to dismiss, Mirmiran averred that: Wireless One requested to terminate its lease and vacate the Market if it was not charged for February 2017 rent; management agreed, and Wireless One voluntarily vacated the premises; CSM did not terminate the lease or notify Wireless One that it had to leave by a certain date; and, as of the date of the affidavit, renovation of the Market had not yet commenced, and no leases of any of the tenants of the Market had been terminated due to the planned renovation.

the tenant to leave. As such, Wireless One does not qualify as a "displaced person" under

the plain language of RP § 12-201(e)(1)(i), and was not entitled to moving and relocation

expenses under RP § 12-205(a).[6]

In addition to our holding that Wireless One is not a "displaced person" under the

---

[6]In this case, Respondents filed a motion to dismiss, or, in the alternative, for summary judgment, arguing, among other things, that Wireless One was not a "displaced person" because Wireless One terminated its lease voluntarily and because of the exemption in RP § 12-201(e)(2)(iii). In its order, the circuit court set forth the standard of review applicable to motions to dismiss, ruled that Wireless One had failed to state a claim under RP § 12-205(a) or for an unconstitutional taking, granted the motion, and ordered that the complaint be dismissed. The record reflects that the circuit court granted Respondents' motion to dismiss on the ground that Wireless One was not entitled to compensation for moving and relocation expenses under RP § 12-205(a) without converting the motion to a motion for summary judgment, or even mentioning the grant or denial of summary judgment. With respect to a trial court's grant of a motion to dismiss, this Court has noted that "[i]n the interest of judicial efficiency, we may affirm the judgment of a trial court to grant a motion to dismiss on a different ground than that relied upon by the trial court, as long as the alternative ground is before the [c]ourt properly on the record." Forster v. State, Office of Pub. Def., 426 Md. 565, 580-81, 45 A.3d 180, 189 (2012) (citations omitted). Here, in its complaint, as to the reason for leaving the market, Wireless One alleged only that it had been told that it would not fit into the plans for redevelopment. Although Respondents alternatively requested summary judgment and attached Mirmiran's affidavit, the four corners of the complaint failed to establish that Wireless One was a displaced person under RP § 12-201(e)(1)(i). Hence, we may affirm the circuit court's dismissal on this ground.

To the extent that the circuit court considered materials outside of complaint, *i.e.*, Mirmiran's affidavit, the circuit court's order reflects that that consideration was as to the issue of the unconstitutional taking. After referencing Mirmiran's affidavit, the circuit court concluded that Wireless One voluntarily abandoned its property affixed to the Market and had failed to state a claim for unconstitutional taking. Again, the circuit court did not convert the motion to dismiss to a motion for summary judgment. However, as to a trial court's grant of summary judgment, we have stated that "[i]f we should reach a different conclusion than the circuit court on the basis on which it granted summary judgment, we ordinarily do not try to sustain the [trial] court's decision on a different ground." Young Elec. Contractors, Inc. v. Dustin Constr., Inc., 459 Md. 356, 383, 185 A.3d 170, 186 (2018) (citation omitted). Nonetheless, "[w]e may [] affirm summary judgment on a different ground if the trial court would have no discretion as to the particular issue." Id. at 383, 185

plain language of RP § 12-201(e)(1)(i) because it abandoned the lease and the property on its own accord, Wireless One is not a "displaced person" because it "lease[d] from the displacing agency after the displacing agency [took] title to the real property[.]" RP § 12-201(e)(2)(iii). The plain language of the exemption in RP § 12-201(e)(2)(iii) is unambiguous and clearly precludes Wireless One from qualifying as a "displaced person." We begin by examining the language of the exemption. By its plain language, RP § 12-201(e)(2)(iii) provides that a "displaced person" does not include "[a] person who leases from the displacing agency after the displacing agency takes title to the real property[.]" This language demonstrates that, where a displacing agency has taken title to real property, a person who leases from the displacing agency thereafter is not a displaced person. In short, the plain language of RP § 12-201(e)(2)(iii) is clear—a person who leases from the displacing agency after the displacing agency takes title to the real property is not a displaced person. We note that both the circuit court and the Court of Special Appeals determined that no ambiguity existed in RP § 12-201(e)(2)(iii) because the plain meaning

---

A.3d at 186 (citation omitted). In this case, if the record could be interpreted to mean that the circuit court granted summary judgment at all, we affirm on the ground that it based its decision on—namely, that the exemption of RP § 12-201(e)(2)(iii) applies and excludes Wireless One from being a "displaced person." We also affirm on the basis raised by the Respondents in the circuit court, but not expressly relied on by the circuit court in determining whether Wireless One was a "displaced person"—namely, that Wireless One voluntarily terminated its lease and abandoned its stall at the Market. As to this issue, Wireless One based its claim on it being a "displaced person," and yet pleaded facts that did not establish that it was a displaced person; as such, the circuit court could not have arrived at any conclusion other than that Wireless One was not a "displaced person" under the statute.

- 26 -

of the language of the statute is obvious.

Here, it is undisputed that the Market was established by the City in 1847, and that it has been owned and operated by the City since its establishment. It was not until 2004, well after the City took title to the Market, that Wireless One entered into its lease. Put simply, it is undisputed that Wireless One acquired its lease after the City acquired title to the Market. Nothing in the management agreement between Respondents and CSM transferred title to the Market; rather, the management agreement simply authorized CSM to operate, manage, and redevelop the Market. As such, it is readily apparent that Wireless One leased its stall in the Market from the City after the City had taken title to the Market, and, therefore, the plain language of RP § 12-201(e)(2)(iii) applies, and Wireless One is not a "displaced person."

We are unpersuaded by the Attorney General's attempt to inject ambiguity into the plain language of RP § 12-201(e)(2)(iii). In the amicus brief, the Attorney General contends:

> [The] statutory language [of RP § 12-201(e)(2)(iii)] is not as clear as the City suggests. First, as Wireless One has argued before this Court, the City's reading of the statute renders the second half of that clause superfluous. As a matter of law, any lease with a displacing agency would, by its nature, take effect only after the displacing agency has acquired the property. In that context, and given the provision's focus on the date that the displacing agency "takes title" to the property, it is unclear whether the statute encompasses all leases no matter when (or for what purpose) the displacing agency may have acquired the property, or whether it applies only in circumstances where the displacing agency acquires a property for a program or project. The latter interpretation not only removes the superfluity in the first clause of [RP] § 12-201(e)(2)(iii), but it harmonizes and maintains consistency with the second clause of [RP] § 12-201(e)(2)(iii). Indeed, that second clause, which excludes from being a "displaced person" a person who occupies a property on a rental basis but who was not "an occupant of such

- 27 -

property at the time it was acquired," is expressly tied to both the operative act of the acquisition of the property and the program or project for which the property was acquired.

In a nutshell, the Attorney General seems to be saying that, if this Court adopts Respondents' position, then no tenant could ever be a "displaced person" because the tenant would be leasing property after the displacing agency acquired title to the property, and the second clause of RP § 12-201(e)(2)(iii) would be rendered superfluous. We disagree.

We are wholly unpersuaded that RP § 12-201(e)(2)(iii) is ambiguous. Rather, it is obvious that there are two separate, disjunctive clauses in that provision, separated by the word "or," defining who is not a "displaced person." In its entirety, RP § 12-201(e)(2)(iii) provides:

> "Displaced person" does not include: [] A person who leases from the displacing agency after the displacing agency takes title to the real property, **or** any person other than a person who was an occupant of such property at the time it was acquired who occupies the property on a rental basis for a short term or period subject to termination when the property is needed for the program or project.

(Emphasis added) (paragraph break omitted). Under the first clause, a displaced person does not include a person who leases from a displacing agency after the displacing agency takes title to the property. As a completely separate example of a person who is not a displaced person, the second clause provides that a displaced person does not include any person other than someone who was an occupant of the property at the time it was acquired who occupies that property on a short-term rental basis or period subject to termination when the property is needed for a program or project. In other words, RP § 12-

201(e)(2)(iii) includes two separate descriptive clauses of persons who are not displaced persons, *i.e.*, two separate clauses defining who is not a displaced person. The provision could not be clearer, and there is no ambiguity. Under the first clause of RP § 12-201(e)(2)(iii), Wireless One is expressly excluded from being a displaced person.

Adhering to the plain meaning of RP § 12-201(e)(2)(iii) does not render either clause of the provision superfluous. The plain meaning of the first clause—*i.e.*, that a displaced person does not include someone who leases from the displacing agency after the displacing agency takes title to the real property—does not mean that any and all lessees will be excluded as displaced persons. Rather, the first clause excludes as displaced persons only those who lease from the displacing agency after the displacing agency takes title to the real property, not all persons who lease from a displacing agency. As Respondents point out, "properties are routinely acquired subject to existing leasehold interests held by third parties." (Citation omitted). For example, a displacing agency such as the City may acquire title to property through eminent domain that is subject to an existing lease. In that situation, where a displacing agency takes title to property that is subject to an existing lease, the lease would predate the agency's taking, and the existing lessee would not be excluded as a displaced person by operation of the first clause of RP § 12-201(e)(2)(iii); under that circumstance, the existing lessee may be entitled to moving and relocation expenses under RP § 12-205(a). The plain language of the first clause of RP § 12-201(e)(2)(iii) simply means that tenants who have leases in effect prior to the transfer of title to a displacing agency may qualify as displaced persons, whereas tenants who leased from the displacing agency after the displacing agency took title would not.

There is nothing ambiguous or superfluous about it. It just so happens that, in this instance, the Market was purchased by the City in 1847, well before Wireless One entered into its lease. It certainly cannot be said that every property that the City develops will have been owned since the 1800s or earlier, or that the first clause of RP § 12-201(e)(2)(iii) precludes compensation for moving and relocation expenses in every case.[7]

Nor does adhering to the plain meaning of the statute render the second clause

---

[7]Similarly, our interpretation of RP § 12-201(e)(2)(iii) would not affect relocation assistance for tenants of public housing, which is governed by a different statute. The Assisted Housing Preservation Act, Md. Code Ann., Hous. & Cmty. Dev. (2005, 2019 Repl. Vol.) ("HS") §§ 7-101 to 7-501, includes HS § 7-219 (Relocation During Rehabilitation), and "applies if a protected action involves substantial rehabilitation or reconstruction that does not allow continued occupancy of a unit because of danger to the health and safety of the household." HS § 7-219(a). "Protected actions" include "the termination before expiration of or failure to exercise any stated renewal option under an agreement providing for project-based § 8 rental assistance for any units in an assisted project[.]" HS § 7-102(a)(2). "A property qualifies as an assisted project if . . . "a loan financing the property is insured or assisted under . . . the National Housing Act[ or] the Housing Act of 1949[.]" HS § 7-105(2)(i).

Specifically, where "a protected action involves substantial rehabilitation or reconstruction that does not allow continued occupancy of a unit because of danger to the health and safety of the household[,]" HS § 7-219(a), HS § 7-219(d) requires payment of relocation expenses, stating:

> (1) The owner shall pay relocation expenses in accordance with [HS] § 7-212(b)(2) [] on or before the date when the designated household vacates the unit.

> (2) The owner shall also reimburse a designated household that returns to its unit under [HS § 7-219](c)(2) [] for its relocation expenses in accordance with [HS] § 7-212(b)[].

In turn, HS § 7-212(b) names specific dollar amounts for relocation expenses, stating:

> Tenant protection assistance consists of:

superfluous.  As we explained above, the second clause excludes from the definition of a displaced person those who occupy a property on a rental basis for either a short term or period subject to termination when the property is needed for the program or project.  To be sure, as Respondents point out, "there may be overlap among tenants excluded by the first clause of [RP § 12-201(e)(2)(iii)] and those excluded by the second," but "each clause covers factual scenarios that the other does not."  (Footnote omitted).  Respondents provide the following examples.  A tenant who enters into a multi-year lease—*i.e.*, a long term, not a short term, lease—after the displacing agency took title would be excluded as a displaced person under the first clause of RP § 12-201(e)(2)(iii), but not by the second clause.  By contrast, a sublessee who leases on a month-to-month, *i.e.*, short-term, basis from a leaseholder after a displacing agency took title would not be excluded as a displaced person under the first clause of RP § 12-201(e)(2)(iii) because it is not leasing from the displacing

---

(1) paying each assisted household $475 on or before the day that the assisted household vacates the unit;

(2) reimbursing each assisted household for relocation expenses exceeding $475 and up to $950, actually and reasonably incurred; and

(3) offering each assisted household that is current in its rent and has not violated any other material term of its lease, a lease extension for at least 1 year from the giving of the notice of intent.

Consistent with the statute described above, according to the Housing Authority of Baltimore City ("HABC")'s website, if a resident has "to move out temporarily during construction or renovation[,] . . . HABC will help [the resident] move[, and] will provide [the resident] with a place to stay."  HABC, What You Should Know About The Rental Assistance Demonstration Program (RAD) Phase III at 1 (Aug. 24, 2018), https://www. habc.org/media/1416/rad-phase-3-faqs-for-residents_82418.pdf [https://perma.cc/Q77M-UFHB].

agency, but the sublessee would be excluded under the second clause.  In short, applying the plain language of RP § 12-201(e)(2)(iii) as we do in this case does not render either clause of the provision meaningless or ambiguous.

We are also unpersuaded that there is any ambiguity in the definition of "displacing agency" in RP § 12-201(f), as the Attorney General contends.  RP § 12-201(f) defines a "displacing agency" as follows:

> "Displacing agency" means any public or private agency or person carrying out:
>
> (1) A program or project with federal financial assistance;
>
> (2) A public works program or project with State financial assistance; or
>
> (3) Acquisition by eminent domain or by negotiation.

Under the plain meaning of RP § 12-201(f)(2), the City plainly qualifies as a displacing agency because it is a public agency carrying out a public works program or project with State financial assistance.  There is simply no ambiguity in the application or definition of a "displacing agency."

Yet, both Wireless One and the Attorney General attempt to read into RP § 12-201(f) a meaning that its language simply does not support.  Wireless One contends that the City did not become a "displacing agency" at the time the Market was established in 1847 because it was not carrying out a public works project with State financial assistance at that time.  Rather, according to Wireless One, the City did not become a "displacing agency" until it started to carry out the program of redeveloping the Market (which occurred after Wireless One entered into its lease), thus rendering inapplicable the

- 32 -

exemption in the first clause of RP § 12-201(e)(2)(iii).  The Attorney General adopts this

rationale and contends that RP § 12-201(f) contains a "latent ambiguity," arguing:

> [B]y using the present progressive tense in the phrase "carrying out," the statutory language appears to suggest that an entity may be considered a "displacing agency" only insofar as it is then-actively and currently engaged in "carrying out" a "program or project" or "[a]cquisition by eminent domain or by negotiation."  This definition of "displacing agency" would thus exclude any entity that acquires (or has acquired) a property while not at that time engaging in these enumerated activities.  And, in turn, interpreting the definition of "displacing agency" in that manner would have a significant and perhaps dispositive effect on the way [RP] § 12-201(e)(2)(iii) should be interpreted.

(Second alteration in original).  In other words, like Wireless One, the Attorney General

posits that the definition of a "displacing agency" would exclude any entity that acquired

a property while not engaging in the described activities of RP § 12-201(f), or, stated

conversely, that an entity qualifies as a "displacing agency" only if it is actively carrying

out a program or project.

We disagree with the manner in which Wireless One and the Attorney General

interpret the plain language of RP § 12-201(f).  Both read words into the definition of a

"displacing agency" that simply are not present in the statute.  RP § 12-201(f) does not

state that an agency becomes a "displacing agency" only when it is actively and currently

engaged in carrying out a federal- or State-funded program or project or acquisition by

eminent domain or by negotiation.  Such a definition reads into the statute language that

just does not exist, and nothing within the text of RP § 12-201(f) remotely suggests such

an exclusion.  Indeed, nothing in the plain language of RP § 12-201(f) includes a temporal

element, such that whether an entity is a "displacing agency" is dependent on when the

entity took title to the property or began carrying out a program or project. As Respondents point out, "[a]n agency may be 'carrying out' a public works program with State financial assistance regardless of when the agency acquired the property involved[,]" and "[t]aking title to a property years (or centuries) prior to starting a public works program has no logical effect on whether an entity is now 'carrying out' such a program and therefore potentially a 'displacing agency' under the statute." In sum, we discern no ambiguity in the definition of "displacing agency" as set forth in RP § 12-201(f).

Because the plain language of RP § 12-201(e) and (f) could not be clearer and given our conclusion that there is no ambiguity in the exemption in RP § 12-201(e)(2)(iii), our analysis could end at this point without resorting to a review of the legislative history. See Lillian C. Blentlinger, 456 Md. at 294, 173 A.2d at 562 ("When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it its written." (Citation omitted)). Although there is no need to review the legislative history, we shall address the matter because the parties and the Attorney General have done so in some detail, and it may be desirable to clear up any confusion about the legislative history of RP § 12-201(e)(2)(iii). We observe that our holding concerning the plain language of RP § 12-201(e)(2)(iii) is fully supported by the legislative history, and that the legislative history does not compel a contrary interpretation. Cf. id. at 309, 173 A.3d at 570 ("Although the language of the statute is clear, a brief review of the legislative history of relevant statutory provisions provides a context for our holding and confirms our

interpretation of the statute." (Cleaned up)). Indeed, our review of the legislative history leads to the conclusion that the bill that became, among other statutes, RP § 12-201(e)(2)(iii), was intended to be similar to its federal counterpart.

We begin by setting forth the party's views of the relevant legislative history. Wireless One contends that the Relocation Expenses Act, RP §§ 12-201 to 12-212,[8] was modeled after, and should be construed consistently with, its federal counterpart, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("the Uniform Relocation Assistance Act"), 42 U.S.C. §§ 4601 to 4655. Similarly, the Attorney General contends that the legislative history of the Relocation Expenses Act "demonstrates a clear intent to make Maryland law consistent with the 1987 amendments (and the Uniform Relocation Assistance Act as a whole)." As such, Wireless One and the Attorney General argue that, RP § 12-201(e)(2)(iii) must be construed to be consistent with its federal counterpart, 42 U.S.C. § 4601(6)(B)(ii), which leads to the result that the exemption in the definition of "displaced person" for a "person who leases from the displacing agency after the displacing agency takes title to real property" applies only where the displacing agency has acquired a property for a program or project and the person's lease begins after such acquisition.

Respondents counter that the General Assembly enacted the definition of "displaced person" in RP § 12-201(e), including the exemption in RP § 12-201(e)(2)(iii), knowing

_____

[8]Although the General Assembly has sometimes enacted statutes that set forth short titles of acts, it did not do so for RP §§ 12-201 to 12-212. That said, in A & E N., 431 Md. at 263, 64 A.3d at 909, this Court referred to RP §§ 12-201 to 12-212 as the "Relocation Expenses Act[.]" We do the same here.

that the definition was different from that in the Uniform Relocation Assistance Act. Respondents contend that, despite being aware of the language in the federal statute, "the General Assembly took a different approach in 1989 when delimiting the class of tenants who fall outside the definition of 'displaced person.'" (Citations omitted). As such, according to Respondents, the General Assembly "deliberately drafted alternative language" from the federal statute, such that, under Maryland law, a tenant who leases property after the displacing agency took title is not a displaced person, notwithstanding whether the displacing agency had plans for rehabilitation at the time of acquisition. In short, Respondents argue that the General Assembly chose to distinguish the Maryland statute from the federal statute.

Our review of the legislative history reveals the following. In 1970, Congress passed the Uniform Relocation Assistance Act "to standardize federal legislation regarding relocation assistance." Alexander v. U.S. Dep't of Hous. and Urban Dev., 441 U.S. 39, 49 (1979). The purpose of the Uniform Relocation Assistance Act was "to establish a uniform policy for the fair and equitable treatment of owners, tenants, and other persons displaced by the acquisition of real property in Federal and federally assisted programs" so "that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." Id. at 51 (cleaned up). As originally enacted, the Uniform Relocation Assistance Act defined a "displaced person" as

> any person who . . . moves from real property, or moves his [or her] personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken

- 36 -

by a Federal agency, or with Federal financial assistance[.]

Id. at 42 n.1 (citation omitted).  Thus, as originally enacted, the Uniform Relocation Assistance Act provided relocation benefits only to those persons who were displaced as a result of government acquisition of property.  See id. at 59 ("[T]he legislative history of the written order clause reveals no congressional intent to extend relocation benefits beyond the acquisition context.").  The Uniform Relocation Assistance Act also contained a provision that conditioned ongoing federal financial assistance upon the receipt of a State's "satisfactory assurances" that "fair and reasonable relocation" assistance would be provided to displaced persons to the same extent as required by federal law.  42 U.S.C. § 4630(1).

The following year, in 1971, the General Assembly enacted the Relocation Expenses Act by passing House Bill 972.  See 1971 Md. Laws 1318 (Ch. 628, H.B. 972). As part of its purpose statement, House Bill 972 provided: "WHEREAS, [the Uniform Relocation Assistance Act] changes the relocation assistance legislation now in effect at the Federal level and requires that in order to obtain maximum Federal funds, for the Federally-aided public projects, the State relocation assistance legislation must conform to the requirements of" that Act.  Id.  House Bill 972 further provided that it was "the legislative intention that persons who are displaced as a result of land acquisition . . . shall not suffer disproportionate injuries as a result of programs designated for the benefit of the public as a whole."  Id. at 1319.  At that time, the Relocation Expenses Act defined a "displaced person" as

any person who . . . moves from real property, or moves his [or her] personal

property from real property, as a result of the acquisition of such property in whole or in part, or as the result of a written order of the acquiring agency to vacate real property for a public works program or project undertaken by the Condemning Authority.

Id.  The Relocation Expenses Act also provided:

Each Condemning Authority may prescribe such rules, regulations[,] and procedures, consistent with the provisions of this subtitle and [the Uniform Relocation Assistance Act] and amendments thereof and rules and regulations issued pursuant thereto, as it deems necessary or appropriate to carry out the provisions of this subtitle and [the Uniform Relocation Assistance Act].

Id. at 1323.  In 1974, the Relocation Expenses Act was recodified at Md. Code Ann., Real Prop. (1974) §§ 12-201 to 12-212.  See 1974 Md. Laws 416-30 (Ch. 12, S.B. 200).

Years later, in 1987, Congress effectuated an expansion of the Uniform Relocation Assistance Act by adopting the current definition of a "displaced person," codified at 42 U.S.C. § 4601(6).  See Pub. L. 100-17, Title IV, § 402.  Under 42 U.S.C. § 4601(6)(A)(i), a "displaced person" includes not only those persons who move from property "as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole for a program or project undertaken by a Federal agency or with Federal financial assistance[,]" but also those who move "as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe[.]"  And, for the first time, the Uniform Relocation Assistance Act expressly excluded certain persons from the definition of a "displaced person," including those persons who occupy the property unlawfully or for the sole purpose of obtaining assistance under the Act.  See 42 U.S.C. § 4601(6)(B)(i).  Importantly, 42 U.S.C. § 4601(6)(B)(ii) was also enacted and provides:

The term "displaced person" does not include[] in any case in which the

displacing agency acquires property for a program or project, any person (other than a person who was an occupant of such property at the time it was acquired) who occupies such property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project.

Additionally, the 1987 amendments added a certification provision, 42 U.S.C. § 4604(a), which provides that

the head of a Federal agency may discharge any of his [or her] responsibilities under this chapter by accepting a certification by a State agency that it will carry out such responsibility, if the head of the lead agency determines that such responsibility will be carried out in accordance with State laws which will accomplish the purpose and effect of this chapter.

After the 1987 federal amendments, at the Governor's direction, the Secretary of Transportation established a task force consisting of agencies that would be affected by the federal amendments. In the meantime, in a letter to the Governor dated December 16, 1988, the Federal Highway Administrator sought to enlist the Governor's "support for the passage in [Maryland] of a comprehensive statute to enable all State, local, and private entities receiving Federal funds to comply with the Uniform [Relocation Assistance] Act, as amended." Letter from Robert E. Farris, Federal Highway Administrator, to William Donald Schaefer, Governor of Maryland (Dec. 16, 1988). In the letter, the Federal Highway Administrator advised that those statutory "assurances must be in place as of April 2, 1989[,]" and, if they were not,

the Federal agency providing the financial assistance for any ongoing project must withhold funding for any acquisitions or displacement occurring on or after April 2, 1989, and further, shall not approve any new activity, project,

or program which will result in acquisition or displacement.

Id.

Ultimately, the interagency task force's work culminated in House Bill 720, which was introduced during the 1989 legislative session. House Bill 720 was:

> FOR the purpose of generally revising State laws on relocation assistance and adopting federal requirements relating to uniform policies and procedures for relocation assistance when permanent displacement occurs as the result of land acquisition, demolition, rehabilitation, and other activities; providing for the uniform treatment of displaced persons; defining certain terms; altering certain payment limits; making this Act an emergency measure; and generally relating to relocation assistance and land acquisition policies in the State.

1989 Md. Laws 1253 (Pt. 2, Ch. 10, H.B. 720). House Bill 720 amended the definition of a "displaced person" to "any person who moves from real property, or moves his [or her] personal property from real property" "as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part by a displacing agency[,]" or "as a direct result of rehabilitation, demolition, or other displacing activity as the lead agency may prescribe[.]" Id. at 1255.

House Bill 720 also added a provision excluding certain persons from the definition of "displaced person," including "any person who, on the open market, without threat of condemnation, sells his [or her] real property to a displacing agency[,]" as well as "unlawful occupants or anyone occupying such dwelling for the purpose of obtaining assistance under" the Relocation Expenses Act. Id. at 1256. Significantly, House Bill 720 added the exemption currently codified at RP § 12-201(e)(2)(iii)—namely, that a

"displaced person" does not include:

> A person who leases from the displacing agency after the displacing agency takes title to the real property, or any person other than a person who was an occupant of such property at the time it was acquired who occupies the property on a rental basis for a short term or period subject to termination when the property is needed for the program or project.

Id.

The bill file for House Bill 720 indicates that the General Assembly intended the Relocation Expenses Act to be similar to its federal counterpart. For example, a document entitled "Analysis of House Bill 720" notes that House Bill 720 "is proposed to bring the Maryland statute into compliance with [the 1987 federal amendments] regarding relocation assistance programs and to provide enabling legislation in order that [S]tate and local displacing authorities may continue to qualify for federal aid funding." The analysis noted that "[l]anguage in the State bill mirrors the federal law in many instances to [e]nsure similar intent and uniformity of both statutes." The analysis also discussed the amendments to the various statutes. As to the amendments to Md. Code Ann., Real Prop. (1974, 1988 Repl. Vol.) § 12-201, the analysis stated, in pertinent part:

> The definition of "displaced person" is being expanded and modified to include permanent displacement resulting from rehabilitation and demolition and certain additional eligibilities for small businesses, farms[,] and residential tenants. Another notable change is [that] all public and private agencies and persons, (whether or not such entity has the power of eminent domain), using federal assistance in a project are required to comply with this act.

And, House Bill 720's Fiscal Note stated that the bill was introduced "in order to bring State law in compliance with federal regulations[.]"

House Bill 720's bill file also contains letters of support from various agencies and

- 41 -

groups that noted that House Bill 720 was necessary to comply with federal regulations. For example, in a letter to the Senate Judicial Proceedings Committee dated March 29, 1989, the Maryland Association of Counties stated that it supported House Bill 720, and that it "underst[oo]d[] that this emergency piece of legislation [was] necessary to place the State in compliance with federal regulations pertaining to relocation assistance." Letter from Raquel Sanudo, Md. Assoc. of Counties, Inc., to Sen. Jud. Proceedings Comm. (Mar. 29, 1989). Similarly, in a letter to the Chair of the Senate Judicial Proceedings Committee dated March 29, 1989, the Maryland Builders Association stated that it supported House Bill 720, and noted that the bill would "define the State laws and federal requirements allowing for uniform treatment of the displaced person. We believe that this improves the law." Letter from Robert L. Mitchell, President, Md. Builders Ass'n, to Sen. Walter M. Baker, Chair, Sen. Jud. Proceedings Comm. (Mar. 29, 1989). In a letter to the Chair of the Senate Judicial Proceedings Committee dated March 28, 1989, the Administrator of the Maryland State Highway Administration sought the Chair's support to expedite House Bill 720, which he characterized as bringing Maryland "into compliance with a federal mandate[.]" Letter from Hal Kassoff, Administrator, State Highway Admin., to Sen. Walter M. Baker, Chair, Sen. Jud. Proceedings Comm. (Mar. 28, 1989). And, in a memorandum dated March 28, 1989, the Secretary of Transportation advised that he supported House Bill 720, which "modifie[d] and expand[ed] the existing [S]tate law to comply with federal law and recommendations by providing a single law applicable to persons permanently displaced for public improvements." Mem. from Md. Dep't of

Transp., Office of the Sec'y, to Sen. Jud. Proceedings Comm. (Mar. 28, 1989).

Interestingly, House Bill 720's bill file also contains a document entitled "Title IV[,] Uniform Relocation Act Amendments of 1987[,] 42 USC 4601[,]" that appears to be a three-page list identifying the various amendments to the Uniform Relocation Assistance Act. With respect to amendments to the definition of "displaced person" in the Uniform Relocation Assistance Act, the document states:

Displaced person

- Expands the definition to include displacement as a result of rehabilitation, demolition[,] and other activities when such displacement is permanent.

- Includes any other person eligible under criteria established by head of lead agency.

- Precludes eligibility for persons on unlawful occupancy.

- Excludes any person who moves in after property is acquired.

(Some capitalization omitted).

House Bill 720 ultimately passed in the General Assembly, and went into effect on April 4, 1989, the date it was enacted. See 1989 Md. Laws 1268 (Pt. 2, Ch. 10, H.B. 720). The definition of a "displaced person" set forth in RP § 12-201(e) and its predecessors, including the exemption in RP § 12-201(e)(2)(iii), has remained unchanged since that time.

What can be gleaned from this legislative history is that, in amending the Relocation Expenses Act through House Bill 720, the General Assembly sought to comply with the 1987 amendments to the Uniform Relocation Assistance Act and related regulations and intended the Relocation Expenses Act to be similar to its federal counterpart. The

legislative history reveals nothing more, and nothing less.  With respect to the exemption in RP § 12-201(e)(2)(iii), if the intent was to largely to comply with the language of 42 U.S.C. § 4601(6)(B)(ii), then the language of RP § 12-201(e)(2)(iii) is quite similar to its federal counterpart.[9]

In our view, RP § 12-201(e)(2)(iii) is not inconsistent with 42 U.S.C. § 4601(6)(B)(ii).  From our perspective, in enacting RP § 12-201(e)(2)(iii), the General Assembly sought to give effect to what appears in 42 U.S.C. § 4601(6)(B)(ii) to be the description of two types of persons who are not displaced persons.  Namely, in the first part of 42 U.S.C. § 4601(6)(B)(ii), in parentheses, Congress excluded as a "displaced person" persons "other than a person who was an occupant of such property at the time it was acquired[.]"  This language is consistent with the first clause of RP § 12-201(e)(2)(iii) that a "displaced person" does not include "[a] person who leases from the displacing agency after the displacing agency takes title to the real property[.]"[10]  In 42 U.S.C. §

_____

[9]It is plausible that, in enacting House Bill 720, the General Assembly pursued one of two possible alternatives.  The first is that the drafters of House Bill 720 were provided with the amended Uniform Relocation Assistance Act and drafted a bill that was intended to be similar to the federal statute, which is dense and not easily decipherable.  The second is that the drafters of House Bill 720 were provided with the amended Uniform Relocation Assistance Act and sought to draft a bill that was intended to be different from the federal statute, but that would be similar enough to pass muster, *i.e.*, the General Assembly intended to enact a different, but close enough, statute to comport with the federal statute.  This appears to be Respondents' position.  Certainly, had the General Assembly intended to draft a statute that departed and differed from the federal statute, the bill file would have contained information to that effect; but, the bill file does not contain such an indication.  In our view, rather, the legislative history supports the first scenario—that the General Assembly intended to draft a bill that was similar to the federal statute.

[10]The document in House Bill 720's bill file that lists the amendments to 42 U.S.C. § 4601 states that one of the amendments to the definition of "displaced person" operated

- 44 -

4601(6)(B)(ii), Congress also excluded as a "displaced person" "in any case in which the displacing agency acquires property for a program or project, any person . . . who occupies such property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project." The second clause of RP § 12-201(e)(2)(iii) encapsulates this exclusion, and provides that a "displaced person" does not include "any person other than a person who was an occupant of such property at the time it was acquired who occupies the property on a rental basis for a short term or period subject to termination when the property is needed for the program or project." Put simply, the language of RP § 12-201(e)(2)(iii) is consistent with, and similar, albeit not identical, to, the language of 42 U.S.C. § 4601(6)(B)(ii). As such, giving effect to the plain language of RP § 12-201(e)(2)(iii) does not run afoul of, or otherwise render the exemption inconsistent with, 42 U.S.C. § 4601(6)(B)(ii).

We disagree with Wireless One and the Attorney General that the language of 42 U.S.C. § 4601(6)(B)(ii) excludes a person from being a displaced person only if the person enters a lease after the displacing agency acquired the property for a specific program or project—*i.e.*, not simply after a person enters a lease after the displacing agency takes title to the property. From a practical standpoint, this reading of 42 U.S.C. § 4601(6)(B)(ii) does not make sense because, if a displacing agency was acquiring property for a specific

---

to "exclude[] any person who moves in after property is acquired." (Capitalization omitted). In other words, the document's interpretation of the exemption included in parentheses in 42 U.S.C. § 4601(6)(B)(ii) is the same as what became the first clause of RP § 12-201(e)(2)(iii).

program or project, it likely would not be leasing to a tenant and then trying to put that tenant out as the program or project progresses.[11] But more importantly, the plain language of neither 42 U.S.C. § 4601(6)(B)(ii) nor RP § 12-201(e)(2)(iii) says this.

Ultimately, the Relocation Expenses Act means what it says, and the language of RP § 12-201(e)(2)(iii) is plain and unambiguous on its face. Thus, resorting to a review of the legislative history is not necessary. Nonetheless, at bottom, the legislative history supports the view that the General Assembly intended the Relocation Expenses Act, as amended, to be similar to its federal counterpart, and that the exemption in RP § 12-201(e)(2)(iii) is not inconsistent with 42 U.S.C. § 4601(6)(B)(ii). Applying the plain and unambiguous language of RP § 12-201(e)(2)(iii), without a foray into the statute's legislative history, comports with our principles of sound statutory construction. In this instance, we apply the plain language of RP § 12-201(e)(2)(iii), with the legislative history not compelling a contrary result.

To be sure, the purpose of the Uniform Relocation Assistance Act and the Relocation Expenses Act is to provide certain benefits to displaced persons. That purpose is not undermined by our holding in this case—namely, that, Wireless One is not a "displaced person," as defined in RP § 12-201(e)(1)(i), because it voluntarily terminated

---

[11]In other words, the City decides what tenants it will lease to, and there would be no opportunity for a tenant to "game the system" by leasing a property after the agency acquires title with the tenant on notice of a redevelopment project unless the City acquiesced to the lease—which it would not if the tenant's occupancy was not consistent with the planned redevelopment. In addition, RP § 12-201(e)(2)(ii) provides that a "displaced person" does not include anyone who occupies a dwelling for the purpose of obtaining moving and relocation expenses assistance.

- 46 -

its lease and, as described in RP § 12-201(e)(2)(iii)'s exemption, because it leased from a displacing agency after the displacing agency took title to the property. The plain language of the exemption of RP § 12-201(e)(2)(iii) does not result in any and all persons being excluded as displaced persons. The circumstances in this case lead to the conclusion, however, that Wireless One is both not a displaced person under RP § 12-201(e)(1)(i) and exempt from qualifying as a displaced person under RP § 12-201(e)(2)(iii).[12]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

---

[12]As a final matter, on brief, Wireless One acknowledges that its claim for "unconstitutional taking depends on whether the City wrongfully denied [it] moving and relocation expenses." Because we determine that the City did not wrongfully deny Wireless One moving and relocation expenses, as Wireless One abandoned the lease and the property, and Wireless One is not a "displaced person" as it "lease[d] from the displacing agency after the displacing agency [took] title to the real property[,]" RP § 12-201(e)(2)(iii), we conclude that there was no unconstitutional taking.

Circuit Court for Baltimore City
Case No. 24-C-17-003125
Argued: May 2, 2019

_____

WIRELESS ONE, INC.

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE, ET AL.

_____

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty
Booth,

JJ.

_____

Dissenting Opinion by McDonald, J.,
which Barbera, C.J., joins.

_____

Filed: August 23, 2019

*Greene, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Md. Constitution, Article IV,
Section 3A, he also participated in the decision
and adoption of this opinion.

"Plain meaning," like beauty, may be in the eye of the beholder. This case provides an example where a focus on one possible "plain meaning" of a statute, together with a blind eye to the statute's history, leads to an interpretation that would undoubtedly astonish those who promoted and passed the statute.

### *Background*

The facts are straightforward. Baltimore City has owned and operated Cross Street Market, in the heart of the Federal Hill neighborhood, since the 1840s. In 2004, Wireless One began renting a stall in the Market for its cellphone business. In 2016, the City entered into an agreement with a management company to operate and rehabilitate the Market. Wireless One apparently did not fit into the management company's new vision for the Market and was informed that its lease would not be renewed. Wireless One vacated the premises and filed suit for relocation and moving expenses.

The City filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. The Circuit Court granted judgment in favor of the City on the ground that Wireless One was not a "displaced person" entitled to relocation benefits under Maryland Code, Real Property Article ("RP"), §12-201 *et seq*. It reasoned that Wireless One fell within an exclusion under that statute for a person who leases from the "displacing agency" after the displacing agency takes title to the property. The Court of Special Appeals affirmed on the same rationale. 239 Md. App. 687 (2018).

*The Alternative Holdings of the Majority Opinion*

The Majority Opinion holds that Wireless One is not a displaced person for two alternative reasons.[1] It is possible that the first reason has merit, but it was not addressed by the Circuit Court, perhaps because there was a dispute over some of the underlying facts pertinent to that issue. In my view, the case should be remanded to the Circuit Court on that issue. The second rationale for the Majority Opinion was addressed by the Circuit Court, but in my view was decided incorrectly.

*Holding Based on Definition in RP §12-201(e)(1)*

First, the Majority Opinion holds that Wireless One voluntarily terminated its lease and abandoned its stall before any redevelopment occurred, and therefore did not fit the definition of a displaced person under RP §12-201(e)(1)(i) for that reason. *See* Majority slip op. at 23-25. This was the primary argument made in the City's Motion to Dismiss or, in the Alternative, for Summary Judgment. In making that argument, the City relied on an affidavit of a partner of its management company to the effect that Wireless One had left voluntarily in return for forgiveness of some of its rent liability. *See* Statement of Grounds and Authorities in Support of Defendant's Motion to Dismiss/Motion for Summary Judgment at pp. 2-4. In opposition, Wireless One submitted an affidavit of its owner asserting that the business had not left the Market voluntarily, but only "because I was told

---

[1] The Majority Opinion also holds that there was no unconstitutional taking of Wireless One's property. Majority slip op. at 47 n.12. (The Circuit Court held that Wireless One failed to state a claim in that regard). That holding is contingent on the Majority Opinion's holdings concerning Wireless One's eligibility for relocation benefits.

I had to leave." The City's reliance on alleged facts outside of the allegations of the complaint meant that the City was seeking, as its motion stated, summary judgment on this ground.[2] *See also* Maryland Rule 2-322(c).

In its ruling in this case, the Circuit Court acknowledged the City's argument on this ground, but did not grant summary judgment for that reason. Instead, it dismissed the complaint on a different ground, to be discussed in greater detail below. Under the longstanding view of this Court, an appellate court ordinarily will not approve a grant of summary judgment on a ground different from that of the Circuit Court. *See, e.g.*, *Mathews v. Cassidy Turley Maryland, Inc.*, 435 Md. 584, 598-99 (2013); *Henley v. Prince George's County*, 305 Md. 320, 333 (1986). Here, the Circuit Court never addressed the merits of this argument, much less determined whether the relevant facts were undisputed such that summary judgment was even feasible. If we think there might be merit in granting judgment on this ground, we should remand for the Circuit Court to consider it in the first instance.

*Holding Based on Exclusion in RP §12-201(e)(2)(iii)*

Second, the Majority Opinion holds that, pursuant to RP §12-201(e)(2)(iii), Wireless One is not a "displaced person" for purposes of the statute because the City acquired title to the Market before it entered into a lease in 2004 with Wireless One.

---

[2] The Majority Opinion suggests that the affidavit submitted by the City was addressed to the issue of whether there was an unconstitutional taking. Majority slip op. at 25-26 & n.6. In fact, most of that affidavit, as well as the opposing affidavit of the owner of Wireless One, was directly addressed to whether the business had *voluntarily* departed from the Market – a key question for purposes of the City's argument under RP §12-201(e)(1).

- 3 -

Majority slip op. at 25-47. This was the basis for the Circuit Court's judgment in this case and thus is properly before us for consideration. The City argued, and the Majority Opinion now agrees, that Wireless One is not entitled to relocation assistance – essentially because its tenancy began after 1847. In so ruling, the Majority Opinion relies heavily on the purported plain meaning of the text of the statute. Wireless One counters that it is entitled to relocation assistance under the statute because a contrary reading would render RP §12-201(e)(2)(iii) inconsistent with a federal statute concerning relocation assistance – *i.e.*, 42 U.S.C. §4601(6)(B)(ii).

The State was invited by the Court to submit an amicus brief in light of the fact that RP §12-201 *et seq*. concerns not only relocation assistance provided by the City but also that provided by the State and other local governments.[3] The State provided an extensive analysis of the statute and its legislative history, which neither party had previously addressed in their briefs. Based on that analysis, the State reached a different conclusion than the City as to the breadth of the exclusion in RP §12-201(e)(2)(iii).

In my view, the Majority Opinion's analysis of RP §12-201(e)(2)(iii) is flawed. For the reasons explained below, I believe that the State's construction of the statute is more reasonable and consistent with the text and its history.

### *Origin of the Maryland Relocation Expenses Act*

The City concedes that Wireless One would be entitled to relocation benefits under a federal statute known as the Uniform Relocation Assistance and Real Property

---

[3] *See* Maryland Constitution, Article V, §6 (Attorney General to be notified immediately of any case "in which the State … has interest").

Acquisition Policy Act of 1970, *codified as amended at* 42 U.S.C. §4601 *et seq.*, if federal funds were involved in the redevelopment of the Market. But it argues that Wireless One is not entitled to those benefits under the State statute. However, as the history of the Maryland statute demonstrates, it was enacted to adopt the same standards as the federal statute and related regulations. *See* Nicole Stelle Garnett, *The Neglected Political Economy of Eminent Domain*, 105 Mich. L. Rev. 101, 121-24 & n.130 (2006) (noting that the Maryland statute was intended to mirror the federal statute). The intertwined history of the federal and State statutes is instructive.

In 1971, in an effort to standardize federal law concerning relocation assistance, Congress enacted the Uniform Relocation Assistance Act, Pub. L. No. 91-646. *See Alexander v. United States Department of Housing & Urban Development*, 441 U.S. 39, 49 (1979). Included in that statute was a provision that conditioned certain federal financial assistance on a state providing relocation assistance to persons displaced by government programs or projects to the same extent as federal law. Pub. L. No. 91-646, §210.

In response to the federal law, the Maryland General Assembly enacted the Maryland Relocation Expenses Act. Chapter 628, Laws of Maryland 1971, *now codified at* RP §12-201 *et seq*. In the preamble to that law, the General Assembly specifically cited the federal statute and the need to ensure that "State relocation assistance legislation must conform to the requirements" of that statute. The preamble further declared the Legislature's "intent to establish a uniform policy for the fair and equitable treatment" of displaced persons. The law also contained a provision that directed agencies and local governments covered by the law to prescribe rules, regulations, and procedures consistent

with both the State statute and the federal statute – a provision that remains in the statute today.  *See* RP §12-210; *see also* Maryland Code, Transportation Article, §8-501 *et seq*. (stating General Assembly's intent that State agencies and political subdivisions comply with the federal Uniform Relocation Assistance Act and "any rule or regulation adopted under" that Act).

The initial iteration of the federal Uniform Relocation Assistance Act had concerned persons displaced by the governmental *acquisition* of property.  In 1987, Congress expanded the Act to include persons displaced by the *rehabilitation* or *demolition* of property with federal funding.  Pub. L. No. 100-17, §402.  The statute excluded certain categories of persons from those benefits, such as persons who occupied the property for the purpose of obtaining benefits under the statute.  *See* 42 U.S.C. §4601(6)(B)(i).  There is also an exclusion, in cases involving the *acquisition* of property, for persons who are not occupants at the time of acquisition.  *See* 42 U.S.C. §4601(6)(B)(ii).  Again, federal funding was made contingent on a state enacting an analogous state-law provision.  Congress established a deadline of April 2, 1989 for states to comply.

The legislative history of the 1987 amendments indicates that Congress intended "that state laws achieve the purpose and effect of the Act, particularly with respect to the definition of displaced person."  House Conf. Rep. No. 100-27, at 250 (reprinted in 1987 U.S.C.C.A.N., v.2, at 234).  The implementing regulations emphasized that the purpose of the new rules was "[t]o ensure that persons displaced as a direct result of Federal or federally-assisted projects are treated fairly, consistently, and equitably so that such displaced persons will not suffer disproportionate injuries as a result of projects designed

for the benefit of the public as a whole." 49 CFR 24.1(b). Federal funding is conditioned on state compliance with these provisions. 49 CFR 24.4(a)(1).

Maryland again responded to the incentive provided in the federal law. An inter-agency task force was established in 1987 at the direction of the Governor, which resulted in the introduction of House Bill 720 at the 1989 session of the General Assembly. The purpose paragraph of that bill recited that it was intended to revise State laws on relocation assistance and "adopt[] federal requirements relating to uniform policies and procedures for relocation assistance when permanent displacement occurs as a result of land acquisition, demolition, rehabilitation, and other activities."

It is clear throughout the bill file for House Bill 720 that compliance with the federal standards, including with respect to the definition of "displaced person," was the catalyst for the legislation. An analysis of House Bill 720 in the bill file notes that "several definitions [in RP §12-201] are being amended or revised to be consistent with those used in the federal legislation," and "the definition of 'displaced person' is being expanded and modified to include permanent displacement resulting from rehabilitation and demolition and certain additional eligibilities for small businesses, farms and residential tenants."

The fiscal note for the bill stated that the legislation's purpose was to make Maryland law compliant with federal regulations. Representatives of State agencies and local governments affected by the bill expressed the same understanding of the legislation. *See, e.g*., Memorandum from the Maryland Association of Counties concerning House Bill 720 to the Senate Judicial Proceedings Committee (March 29, 1989) ("this emergency piece of legislation is necessary to place the State in compliance with federal regulations

pertaining to relocation assistance."); Letter from the Administrator of the Maryland State Highway Administration to the Chairman of the Senate Judicial Proceedings Committee concerning House Bill 720 (March 28, 1989) (asking for bill's passage to be expedited to bring Maryland "into compliance with a federal mandate[.]"). Nothing in the bill file suggests any intention to deviate from the federal standards in any respect.

The General Assembly enacted House Bill 720 on an emergency basis with an effective date of April 4, 1989. Chapter 10, Laws of Maryland 1989. That law amended the definition of "displaced person" and included the language that now appears in RP §12-201(e)(2)(iii).

### *Construing RP §12-201(e)(2)(iii) Consistently with the Federal Statute*

In holding that the slightly different language of the Maryland statute signals a significant departure from the federal statute on which it was based, the Majority Opinion asserts that "the plain meaning of the language of the statute is obvious" and that it "could not be clearer." Majority slip. op. at 26-27, 29, 34. However, the key provision of the statute pertinent to this case seems to contain at least some ambiguity. It states:

"Displaced person" does not include:

> A person who leases from the displacing agency after the displacing agency takes title to the real property, or any person other than a person who was an occupant of such property at the time it was acquired who occupies the property on a rental basis for a short term or period subject to termination when the property is needed for the program or project.

RP §12-201(e)(2)(iii). As is evident, the phrase "displacing agency" appears twice in this provision. The statute elsewhere defines a "displacing agency" as "any public or private

- 8 -

person carrying out: (1) a program or project with federal financial assistance; (2) a public works program or project with State financial assistance; or (3) acquisition by eminent domain or negotiation." RP §12-201(f). Notable in this definition is the use of present participle. The phrases "displacing agency" and "carrying out" both denote an actor currently effecting a displacement. Under this reading, Baltimore City did not become a "displacing agency" until it commenced the effort to rehabilitate the Market – a time at which Wireless One was already a tenant. In other words, a displaced cellphone business need not have had a market stall in 1847 to even be eligible for relocation assistance.

The Majority Opinion argues that such an interpretation reads words into the statute that do not exist, claiming "nothing in the plain language of RP § 12-201(f) includes a temporal element." Majority slip op. at 33. This is true only if one ignores the repeated use of the present participle in the sentence ("displacing agency" and "carrying out"). It is theoretically possible, on the face of the statute, that the Majority Opinion's interpretation could be correct and that an agency that acquired its property decades ago would never be liable for relocation assistance. But this is not unambiguously clear from the text of the statute.

There is a more significant issue with the Majority Opinion's reading of the first clause of the provision ("A person who leases from the displacing agency after the displacing agency takes title to the real property"). If it means that no person who leases property from the government (after the government takes title to the property) can be eligible for relocation expenses, then very few tenants will be eligible for relocation expenses under Maryland law. Moreover, such a reading of the first clause renders

superfluous the second clause of the provision ("or any person other than a person who was an occupant of such property at the time it was acquired …"). This Court has long explained that "whenever possible, the statute should be read so that no word, sentence, clause or phrase is rendered superfluous or nugatory." *See Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302 (2001).

There is a different reasonable reading of the first clause. Large public works projects often suffer from time lags and delays for numerous reasons, including litigation. This means that existing facilities may continue to operate without change for months or years before a rehabilitation or demolition project begins (as has been the case with the Market project). As a result, someone might try to game the system by leasing a property after an agency acquires title for a project and then, even though fully on notice about the timeline of the project, demand compensation when the rehabilitation or demolition project eventually commences. The first clause of RP §12-201(e)(2)(iii) can be read as simply discouraging such behavior and thereby fulfilling the same function as 42 U.S.C. §4601(6)(B).

In my view, this narrower reading of the first clause makes more sense. Importantly, it addresses a real concern without being overbroad, in a way that is completely consistent with the federal statute and regulations. The standards included in the federal statute were intended to counteract the "'violent unfairness' of tenants' forced displacement" by government projects and the "substantial financial hardship" suffered by individuals displaced from their residences. Garnett, *supra*, 105 Mich. L. Rev. at 107, 121-23. The standards of the federal Uniform Relocation Assistance Act apply, with some exceptions,

to public housing programs of the federal Department of Housing and Urban Development. *See* https://perma.cc/GK8C-EDD3. There is no blanket exclusion under that law simply because a housing agency had title to a property before a tenant moved in. Under the Majority Opinion's interpretation of the State statute, similar relocation assistance would not be available under the State statute on the happenstance that an agency owned a residential property before a tenancy began, even if the displacement occurred years or decades hence. As this Court has frequently said, "[o]ur interpretation should avoid illogical, absurd, or anomalous results." *Blackburn Ltd. Partnership v. Paul*, 438 Md. 100, 122 (2014).

At the very least, the language of the exclusion from the definition of displaced person is ambiguous and that text should be considered in light of the legislative history of the statute and the parallel federal exclusion. As outlined above, the legislative history of the 1989 amendment that resulted in this language is quite clear on the Legislature's intent. Accordingly, I would not decide this case on an interpretation of a particular "plain meaning" of RP §12-201(e)(2)(iii) that happens to be contrary to that intent.

Chief Judge Barbera has advised that she joins this opinion.